The Honorable Jim Lendall State Representative 10625 Legion Hut Road Mabelvale, Arkansas 72103-2207
Dear Representative Lendall:
I am writing in response to your request for an opinion on two questions concerning the feeding of homeless people in the "River Market" area of Little Rock. Specifically, you note that the City of Little Rock, through its Parks and Recreation Department, issued a memorandum to River Market vendors. You have attached a copy of the memo for my review. It discourages vendors from feeding the homeless by stating in relevant part as follows:
 Your business is your business but when you decide to feed the homeless you are helping create a situation that may not be bad but could get worse for all of us. When you choose to feed the homeless word of mouth makes us a target and home for this group. When you feed the homeless they tend to hang around more — they hang out all day and this can be offensive to our regular customers.
 Management's policy is that if we see a member of this group with something to eat or drink then they are considered a customer — it is not our right to go up and ask them if how [sic] they got their food. The gray area is how long do we let them occupy public seating? Our stand right now is that if they have something to eat or drink, it is a slow time and there is plenty of other seating and they are not sleeping or disturbing other customers then we allow it. If they are sleeping or disruptive we will ask them to leave and possibly call the District Police.
 Please do not feed the homeless! If this situation grows we will face serious problems. Please make sure that you share this information with your employees — they may feel sympathetic or pressured when you are not around and think that they are doing a `good thing' not a bad thing.
You pose two questions regarding this language of the memorandum, as follows:
 1. Can the Little Rock Parks and Recreation Department prohibit authorized food vendors in its River Market area from feeding homeless people for free?
 2. What are the limits that the City of Little Rock can place on the occupancy or the peaceful presence of homeless people in the public areas of the River Market?
RESPONSE
It is difficult to answer your first question because it appears to be hypothetical. That is, under the information you have enclosed, the City of Little Rock does not currently "prohibit" food vendors in the River Market from feeding the homeless. The City, through a division of its Parks and Recreation Department, has merely discouraged the practice. It is difficult to analyze this action for any potential illegality or unconstitutionality when it does not, by its own terms, bind any food vendor or impose any sanction for its violation. In addition, the facts regarding a particular vendor's legal or constitutional claim will be relevant in determining the legality of any such hypothetical prohibition. I have set out the most analogous law I can find on the question below.
Your broad second question is also difficult to answer in any comprehensive fashion. Specific answers would have to be based upon particular City Code provisions and the enforcement thereof in light of particular factual scenarios. Generally speaking, however, the City may police the River Market public area and make arrests or take other law enforcement actions in response to violations of valid laws, but may not punish persons through police action based merely upon their "peaceful presence" or status as homeless persons.
Question 1 — Can the Little Rock Parks and Recreation Department prohibitauthorized food vendors in it River Market area from feeding homelesspeople for free?
The question of whether the City of Little Rock could actually prohibit River Market restaurant vendors from feeding the homeless would have to be analyzed in light of a particular city prohibition and in light of the facts regarding a particular vendor. There are very few reported cases discussing city prohibitions against feeding the homeless. The few reported cases turn pivotally on the particular regulation and the claims asserted by the food provider.
For example, some cities have enacted ordinances or park rules that require special permission prior to providing "social services" such as feeding programs in certain areas. See e.g., Abbott v. City of FortLauderdale, 783 So.2d 1213 (Fla. 2001). Other cities have attempted to regulate homeless feeding programs through zoning ordinances. See e.g.,Western Presbyterian Church v. Board of Zoning Adjustment of the Districtof Columbia, 862 F.Supp. 538 (D.D.C. 1994) and St. John's EvangelicalLutheran Church v. City of Hoboken, 479 A.2d 935 (N.J.Super.Ct. Law Div. 1983). In the first two cases cited above, the providers of the food programs contended that the municipal restrictions violated their rights under the state or federal "Religious Freedom Restoration Act" ("RFRA") and/or constitutional guarantees. See Fla. Stat. Ann. § 761.03(1)(a)-(b) and 42 U.S.C. § 2000bbb to 2000bb-1.[1] In the third-cited case, the plaintiff relied on the "Free Exercise" Clause of the United States Constitution. The plaintiffs contended that restricting the feeding of the homeless placed a substantial burden on the providing of charitable services, an integral part of the each plaintiff's religious beliefs and that the regulations were not the least restrictive means of furthering a compelling governmental interest. Each plaintiff in the cases above substantially prevailed on this theory, although in Abbott, the city was allowed to provide an alternate site on public property on which the feeding program could take place. But see, Daytona Rescue Mission, Inc.v. City of Daytona Beach, 885 F. Supp. 1554 (M.D. Fla. 1995) (rejecting a church's Free Exercise and RFRA claims under similar circumstances). Seealso, Note, "The Substantial Burden of Municipal Zoning: The ReligiousFreedom Restoration Act as Means to Consistent Protection forChurch-Sponsored Homeless Shelters and Soup Kitchens," 4 Wm. Mary Bill Rts. J. 1259 (1996).
Obviously, however, not every potential plaintiff/restaurant owner in the River Market would be in a position to challenge an anti-feeding prohibition on religious grounds. The success of any other type of legal or constitutional claim, including a "free speech," "association" or "due process" claim, would have to be analyzed with reference to all the facts. Again, reported cases discussing restrictions on feeding the homeless are few. There are a great many more reported cases discussing city prohibitions against conduct of the homeless persons themselves, as opposed to those who would aid them. This brings us to your second question.
Question 2 — What are the limits that the City of Little Rock can placeon the occupancy or the peaceful presence of homeless people in thepublic areas of the River Market?
There are a great many reported cases challenging police actions taken against the homeless on various grounds. I will list and summarize some of these cases below. The particular city ordinance, regulation or action is typically scrutinized for any illegality or unconstitutionality. You have not presented me with any particular Little Rock city ordinance or binding regulation restricting activities of the homeless, so obviously, I cannot come to any definite legal conclusion about a particular police action.
Generally speaking, however, the City may pass ordinances to regulate the criminal actions of homeless persons, but may not punish such persons based solely on their status as homeless persons. Compare Robinson v.California, 370 U.S. 660 (1962) (California statute making it a misdemeanor to "be addicted to narcotics" violates Eighth Amendment prohibition against cruel and unusual punishment because it punishes "status," conceded to be a mental or physical illness, as opposed to particular criminal behavior); with Powell v. Texas, 392 U.S. 514 (1968) (chronic alcoholic's arrest for public intoxication did not violateEighth Amendment because he was punished for act of being drunk in public, rather than for his mere status as an alcoholic).
A number of reported cases involve city ordinances, for example, criminalizing camping, sleeping or storing personal property in certain public places. Other ordinances prohibit panhandling or begging. Other regulations or policies may more stringently regulate or punish persons based upon their appearance or hygiene in particular public venues, such as public libraries. The various kinds of city ordinances on the topic have been challenged by homeless persons, or by others on their behalf, as being unconstitutionally vague, as violating the Eighth Amendment prohibition against cruel and unusual punishment, as violating the homeless person's fundamental right to travel, as restricting theirFirst Amendment rights of free speech, or denying them equal protection or due process of the law. Most of the reported cases sustain the constitutionality of the ordinances in question, as long as they represent a criminalization of conduct rather than mental or physicalstatus.
As a general matter, therefore, police conduct will be enjoined if it is directed at the mere presence of homeless persons as opposed to some criminal conduct or act undertaken by them. See e.g., Justin v. City ofLos Angeles, 2000 WL 1808426 (C.D. Cal. 2000) (enjoining police from stopping the homeless without reasonable suspicion while they are simply standing or walking on public streets or sidewalks unless they are obstructing or blocking free passage thereon) and Streetwatch v. NationalR.R. Passenger Corporation, 875 F.Supp. 1055 (S.D.N.Y. 1995) (enjoining private Amtrak police from arresting or ejecting persons present in public areas of a railroad station without evidence that persons were committing crimes, loitering in private businesses, sleeping in the station or sitting in areas reserved for private passengers).
The mere "peaceful presence" of homeless persons, as you characterize it, may not, in most instances, be criminalized. See e.g., Papachristouv. City of Jacksonville, 405 U.S. 156 (1972) (striking down vagrancy ordinance as unconstitutionally vague and as placing unfettered discretion in hands of police); and Chicago v. Morales, 527 U.S. 41
(1999) (Chicago's "Gang Congregation Ordinance," which prohibited criminal street gang members from loitering in public places, violated the due process clause as an impermissibly vague and arbitrary restriction on personal liberty).
Along similar lines, at least one court has held that a library regulation denying access to persons with an "objectionable appearance" including "body odor, filthy clothing, etc." was unconstitutionally vague and overbroad under the First and Fifth Amendments. Armstrong v. Districtof Columbia Public Library, 154 F.Supp.2d 67 (D.D.C. 2001). At least one other court disagrees, however. See, Kreimer v. Bureau of Police for Townof Morrison, 958 F.2d 1242 (3rd Cir. 1992) (library rule denying access to persons with "offensive" bodily hygiene was not unconstitutional).
With regard to ordinances prohibiting "camping," "lodging," "sleeping" or storing personal property in certain areas, most of the ordinances have been upheld as against claims by homeless persons. See e.g., Johnson v.City of Dallas, 141 F.Supp.2d 645 (N.D.Tex. 2001) (arrests of homeless persons for violating city ordinance prohibiting sleeping in public were presumptively valid under federal and Texas constitutions); Joel v. Cityof Orlando, 232 F.3d 1353 (11th Cir. 2000), cert. denied ___ U.S. ___,121 S.Ct. 1616 (2001) (city ordinance prohibiting "camping" on public property was not unconstitutionally vague, was rationally related to governmental interest, and did not unconstitutionally punish "status" as opposed to conduct for Eighth Amendment purposes at least where adequate shelter space was available); Davison v. City of Tucson, 924 F.Supp. 989
(D.Ariz. 1996) (city resolution authorizing police to terminate homeless "encampment" on city-owned property under state trespassing statutes did not unconstitutionally burden the homeless' right to travel); Roulettev. City of Seattle, 97 F.3rd 300 (9th Cir. 1996) (ordinance prohibiting persons from sitting or lying down on a public sidewalk in certain areas did not violate First Amendment or substantive due process); (Tobe v. City of Santa Ana, 9 Cal.4th 1069, 892 P.2d 1145
(1995) (ordinance prohibiting "camping" and storing of personal property in designated public areas was not facially unconstitutional as impermissibly vague or overbroad and did not punish status or unconstitutionally restrict the fundamental right to travel); Joyce v.City and County of San Francisco, 846 F.Supp. 843 (N.D.Cal. 1994) (class of homeless plaintiffs did not have a likelihood of success on the merits against city "Matrix Program" which addresses offenses such as public drinking, obstruction of sidewalks, camping or sleeping in public parks, etc., because the program did not unconstitutionally punish status as opposed to conduct, did not violate equal protection, due process or right to travel); and Stone v. Agnos, 960 F.2d 893 (9th Cir. 1992) (homeless person's arrest for sleeping in a public plaza did not violate hisFirst Amendment rights or rights to due process of law).
One court disagrees. See Pottinger v. City of Miami, 810 F.Supp. 1551
(S.D.Fla. 1992) (application of various city ordinances prohibiting persons from obstructing sidewalks, sleeping, loitering and trespassing in public places to homeless people violated Eighth Amendment and fundamental right to travel, at least where insufficient shelter space necessitated their presence in public).
With regard to ordinances prohibiting panhandling or begging, most of the ordinances have been upheld. See e.g., Gresham v. Peterson, 225 F.3d 899
(7th Cir. 2000) (ordinance prohibiting street begging in certain places and prohibiting "aggressive panhandling" entirely did not violate theFirst Amendment and was not unconstitutionally vague); Smith v. City ofFort Lauderdale, 177 F.3rd 954 (11th Cir. 1999), cert. denied,528 U.S. 966 (1999) (city regulation banning begging on five-mile strip of beach and two attendant sidewalks was narrowly tailored to serve City's interest in providing safe, pleasant environment and did not violate free speech rights); Greater Cincinnati Coalition for the Homeless v. City ofCincinnati, 56 F.3rd 710 (6th Cir. 1995) (neither individual plaintiffs nor coalition challenging anti-begging ordinance had standing to raise free speech challenge to ordinance); and Young v. New York CityTransit Authority, 903 F.2d 146 (2nd Cir. 1990), cert. denied,498 U.S. 984 (1990) (transit authority regulation banning begging and panhandling in subway system did not violate First Amendment).
One case disagrees. See Loper v. New York City Police Department,802 F.Supp. 1029 (S.D.N.Y. 1992), aff'd. 999 F.2d 699 (2nd Cir. 1993) (provision of New York penal law providing that person is guilty of loitering when he loiters in a public place for purpose of begging violates the First Amendment).
As can be seen from the citations to the various cases above, each asserted infraction must be evaluated on its own facts. I hope that the foregoing discussion is helpful in analyzing the question. There is a great deal of legal commentary on the topic. For additional reading material you may wish to review Comment, City of Brotherly Love?: Usingthe Fourteenth Amendment to Strike Down an Anti-Homeless Ordinance inPhiladelphia, 3 U. Pa. J. Const. L. 540 (2001); Ellickson, ControllingChronic Misconduct in City Spaces; Of Panhandlers, Skid Rows, andPublic-Space Zoning, 105 Yale L.J. 1165 (1996); Walters, No Way Out:Eighth Amendment Protection for Do-Or-Die Acts of the Homeless, 62 U. Chi. L. Rev. 1619 (1995); and Simon, Towns Without Pity: A Constitutionaland Historical Analysis of Official Efforts to Drive Homeless PersonsFrom American Cities, 66 Tul. L. Rev. 631 (1992).
Senior Assistant Attorney General Elana C. Wills prepared the foregoing opinion, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
MP:ECW/cyh
[1] This federal act was later declared unconstitutional in City ofBoerne v. Flores, 521 U.S. 507 (1997).